## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DAVID DUNNING,

      Plaintiff,                           CASE NO. 04-CV-10341-BC

v.                                    DISTRICT JUDGE DAVID M. LAWSON
                                         MAGISTRATE JUDGE CHARLES BINDER

UNITED PARCEL SERVICE,

      Defendant.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON
## UPS'S MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR
## FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 12(c) & 56
(Dkt. 13)
## UPS'S CONTINUED MOTION FOR JUDGMENT ON THE PLEADINGS
## AND/OR FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 12(c) & 56
(Dkt. 45)
## AND PLAINTIFF'S MOTION FOR IMPOSITION OF SANCTIONS
(Dkt. 37)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that:

1) UPS's Motion and Continued Motion for Judgment on the Pleadings and/or Summary

Judgment Pursuant to Fed. R. Civ. P. 12(c) & 56 (Dkts. 13 and 45) be **DENIED,** and

2) Plaintiff's Motion for Imposition of Sanctions (Dkt. 37) be **DENIED**.

## II.   **REPORT**

### A.   **Introduction**

Pending, pursuant to Orders of Reference from United States District Judge David Lawson (Dkts. 17, 39), are the above-entitled motions.  Plaintiff has filed a response to Defendant's motion for judgment on the pleadings (Dkt. 19), and Defendant has filed a reply (Dkt. 20.)  Attached to these documents are a total of 21 exhibits comprised of copies of proceedings before the Michigan Bureau of Workers' Disability Compensation, medical records, and affidavits.  Oral argument was heard on June 3, 2005.

After additional discovery, Defendant filed a Continued Motion for Judgment on the Pleadings on November 15, 2005.  Plaintiff filed a response (Dkt. 50), and Defendant filed a reply (Dkt. 59).  Attached to these documents are a total of 20 exhibits comprised of copies of deposition transcripts, job descriptions, equipment listings, portions of a collective bargaining agreement, employee listings, affidavits and UPS procedures.   On December 22, 2005, Plaintiff filed a Supplemental Brief (Dkt. 54) which includes a copy of the deposition[1] of Dr. Michael Austin, one of Plaintiff's treating physicians.

Plaintiff filed its motion for sanctions on September 13, 2005.  Defendant filed a response (Dkt. 41), and oral argument was heard on that motion on October 6, 2005.  Attached to these documents are nine exhibits comprised of copies of correspondence between the parties.  The motions are now ready for Report and Recommendation.

---

[1]Attached to this deposition are numerous exhibits comprised of copies of Plaintiff's medical records, many of which appear redundant to exhibits attached to Defendant's original motion and Plaintiff's response.

**B.     Background**

Plaintiff commenced employment with Defendant United Parcel Service ("UPS") in 1974. He first worked loading and unloading trucks, and from 1977 to the present time, he worked as a delivery driver on a rural route with numerous stops.  (Def.'s Mot., Dkt. 13, Ex. 1 at 17-18, 24-25.)

Plaintiff filed suit in the Saginaw, Michigan, Circuit Court on November 9, 2004.  Plaintiff recounts a February 2004 restriction issued by Dr. Austin for driving a power steering vehicle, followed by shoulder surgery performed in June 2004.  (Compl., Dkt. 1, ¶¶ 15-17.)  Plaintiff alleges that in September 2004, Dr. Austin cleared Plaintiff to return to work with a permanent restriction to a vehicle with power steering.  (*Id.* ¶ 18.)  Plaintiff alleges that since that time, Defendant has refused to reinstate Plaintiff, even though he has made repeated requests to return to work, "despite the fact that he is currently able to perform the essential functions of his position."  (*Id.* ¶ 20.)

Plaintiff's complaint alleges violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MCLA 37.1101 *et seq.* Plaintiff's complaint includes six counts; violations of the FMLA (Count I), violation of the ADA (Count II), violations of the PWDCRA (Count III), retaliation under both the ADA and the PWDCRA (Counts IV & V), and violations of public policy under Michigan's Disability Compensation Act (Count VI).  Plaintiff alleges that Defendant's policies "[i]ntentionally discriminate against employees with a record and/or a history of a disability," and "[a]re coercive and adversely impact upon employees in the exercise of their rights under the FMLA [Family Medical Leave Act]" and "[v]iolate the public policy of the state of Michigan and the anti-

retaliation clauses of the ADA and the PWDCRA." (Compl. ¶ 3.) Defendant removed the case to this Court on December 7, 2004.

### C.   Facts

### 1.   1992 through 1996[2]

Records of the Saginaw General Hospital Employee Health Center indicate that in March 1992, Plaintiff was seen for discomfort in his right shoulder and right arm. Plaintiff was diagnosed with myofascial syndrome in the posterior right shoulder. Electromyographic testing was normal except for some mild changes in the right wrist. Thereafter, Plaintiff underwent physical therapy on a number of occasions between August and November 1993.

In late August 1993, Plaintiff was seen again for pain in his right shoulder which had increased during the past month. Shoulder range of motion was "within functional limits although with some pain." Strength was considered "good." The examining physical therapist found that Plaintiff's cervical spine exhibited normal range of motion with some mild increase in pain when bending to the left. During this period, physicians at the Employee Health Center recommended that Plaintiff not be required to work. Medical records of Dr. Michael Austin, D.O., indicate that in early December 1993, a doctor completed a notice that Plaintiff would be off work for the next two months and that surgery was scheduled for later in December.

On April 12, 1994, Dr. Austin forwarded a letter to an employee of an insurance company describing his treatment of Plaintiff. The doctor stated that Plaintiff was "unable to do all of the substantial responsibilities and duties of his occupation. He can do many of those duties. . . . It is my opinion that he is partially disabled in the sense that he can perform many of the substantial

---

[2]The information in this section is taken from Plaintiff's Response, Dkt. 19, Exhibits 3 and 4, unless otherwise noted.

duties of his job as a U.P.S. driver.  Basically he could not do work that is over shoulder level or away from the body.  He could not do repetitive work with the upper extremity."  The doctor stated that Plaintiff had surgery in late December 1993 and has "had persistent problems since then.  At this point, I am disappointed with his recovery and have restricted him from lifting or carrying more than 30 pounds."  The doctor stated that he was continuing to treat Plaintiff and was scheduled to evaluate him again in the near future.

In April and May 1994, the doctor stated that Plaintiff should remain off work through mid-June of that year.  In late July 1994, Dr. Austin reported that Plaintiff "has improved with therapy but he persists in having pain."  In late August 1994, Dr. Austin reported that a work hardening physical therapy process was not as successful as he had hoped, and the doctor was planning to keep Plaintiff off work for an additional six weeks.  On September 15, 1994, Dr. Austin completed a report stating that Plaintiff could return to work on October 1 of that year and that he should not lift more than 70 pounds.  The doctor stated that Plaintiff should not work over four hours a day for the first two weeks and then six hours a day for two weeks thereafter.  Plaintiff returned to work October 1, 1994, after having been off work since July 1993.  (Dunning Aff., Dkt 19, Ex. 1, ¶¶ 2-7.)

In mid-November 1994, Dr. Austin reported that Plaintiff's shoulder was "holding up quite well to regular work."  The doctor stated that Plaintiff was "doing well enough that he would like to continue."

In mid-January 1995, Dr. Austin reported that Plaintiff had reinjured his shoulder and may require further arthroscopic examination.  The same day, Dr. Austin completed a report stating that Plaintiff should be off work for the next two months.  In mid-February, Plaintiff underwent an arthroscopic resection of his AC joint.  The doctor reported that Plaintiff was "moving better than

5

he was before." By late April 1995, the doctor stated that Plaintiff was "still having problems with his shoulder, but he is getting better. He feels that he is much ahead of where he was the last time we did his shoulder." The same day, Dr. Austin stated that Plaintiff could return to work with no right-handed work for the next eight weeks. During June and July 1995, Dr. Austin reported that Plaintiff continued in physical therapy, and by mid-July, he reported that Plaintiff's shoulder "continues to improve," although the doctor felt that Plaintiff should continue with therapy and remain off work. In August and October 1995, Dr. Austin completed reports stating that Plaintiff could return to work with restrictions. In mid-December 1995, the doctor continued recommendations that Plaintiff continue with restricted work, stating that he should work four hours a day for one week and then six hours a day for a second week. The doctor stated that Plaintiff's shoulder "seem[ed] to be making progress," although he was still having some tenderness. The doctor felt that Plaintiff was "gaining strength and motion." He recommended that Plaintiff continue with physical therapy.

In January 1996, Dr. Austin stated that Plaintiff was tolerating well a home rehabilitation program. The doctor stated that Plaintiff's shoulder "looks pretty good today." He stated that Plaintiff could return to work at the end of the month. Plaintiff returned to work January 31, 1996, after being off work since January 19, 1995. (Dunning Aff., Dkt 19, Ex. 1, ¶¶ 8-11.) In mid-February 1996, the doctor stated that Plaintiff was working without restrictions, and that although Plaintiff's shoulder was giving him "a few aches and pains, . . . overall he seems to be holding up to it." A similar favorable report was made in early May 1996.

## 2.    2000 through 2003[3]

In late September 2000, Plaintiff again injured his left shoulder.  (Dunning Aff., Dkt 19, Ex. 1, ¶ 13.)  On November 9, 2000, Dr. Sushil Mankani, M.D., reported that Plaintiff strained his shoulder while reaching behind him to close a bulkhead door.  (Pl.'s Resp., Dkt. 19.)  The date of injury listed on the report is November 1, 2000, and the doctor stated that Plaintiff worked for about one week thereafter.  The doctor completed a report stating that Plaintiff should restrict his work to prohibit overhead work and lifting more than 30 pounds for the next two months.  In early March 2001, Dr. Austin reported that Plaintiff had arthroscopic surgery to the left shoulder one week earlier.  The doctor was hopeful that Plaintiff could make a rapid recovery.

In early April 2001, Dr. Austin reported that Plaintiff's shoulder was "moving very well," but by mid-May 2001, he reported that Plaintiff's recovery was "a little slow."  According to the doctor, the motion in the shoulder was "good but it is not as good as I would expect it to be at two months" post surgery.  The doctor also noted that Plaintiff's strength was significantly decreased, and he recommended that Plaintiff undertake physical therapy.  In mid-June 2001, the doctor reported that Plaintiff was improving and that physical therapy was helping range of motion in his shoulder.  By mid-August 2001, Dr. Austin reported that Plaintiff "has improved significantly with physical therapy."  However, the doctor felt that Plaintiff was not yet ready to return to work without restrictions.

In mid-September 2001, Dr. Austin reported that Plaintiff was "still not doing well with pain and he is not doing well with activities away from his body or over shoulder level."  The doctor was surprised that Plaintiff was having this level of difficulty and recommended

---

[3]The information in this section is also taken from Plaintiff's response, Dkt. 19, Exhibits 3 and 4, unless otherwise noted.

continuation of physical therapy.  The doctor continued to state that Plaintiff should not return to work.

In mid-October 2001, the doctor stated that physical therapy was assisting him, and the doctor felt that Plaintiff should "continue being active within the limits of comfort."  The doctor felt that Plaintiff "could do a lot of the work of a UPS driver for a brief period of time, but he certainly could not do it for an unrestricted period of time."  Physical therapy was continued, and the doctor felt that Plaintiff was not yet ready to return to work.  Plaintiff returned to work November 23, 2001, after having been off work since February of that year.  (Dunning Aff., Dkt 19, Ex. 1, ¶ 17.)  By late November 2001, the doctor reported that Plaintiff had returned to work three days previous and had "held up okay[.]" (Dkt. 19, Ex. 4.)  A similar report was made in late December 2001.  The doctor also stated that although Plaintiff had some pulling and mild tenderness, he had "excellent strength."

### 3.    January 2004 to the Present

Medical records attached to Plaintiff's response indicate that Plaintiff again injured his left shoulder in late January 2004.  (Pl.'s Resp., Dkt. 19, Ex. 4; Dunning Aff., Dkt 19, Ex. 1, ¶ 18.)  In January and February 2004, physicians at the Covenant Occupational Health Services Department stated that Plaintiff could return to work as long as he had the use of a vehicle with power steering.

On February 16, 2004, Dr. Austin cleared Plaintiff to return to work for the next six weeks so long as the truck he was driving had power steering.  (Def.'s Mot., Dkt. 13, Ex. 2.)  On February 25, 2004, according to Plaintiff's testimony at a later Workers' Compensation hearing, Plaintiff's Manager, Brad Keefer, told him that there were no longer any jobs for him, since he required a power steering vehicle, that he had been placed into "temporary alternate work"

("TAW"), but that this temporary period was ending.  (*Id*., Ex. 1 at 43.)  Keefer confirmed this conversation during his testimony at the Workers' Compensation hearing.  (*Id.* at 81.) Approximately one week later, he began receiving Workers' Compensation benefits.  (*Id*. at 45.)

On March 3, 2004, Plaintiff was examined at the request of an insurance company by Dr. Michael E. Holda, M.D.  Plaintiff described pain in the left shoulder, which was aggravated by turning his head to the right or using his left arm over his shoulder level.  (*Id*., Ex. 3.)  Plaintiff also described occasional numbness in the left hand, but no numbness or pain was described in the right arm or shoulder.  Plaintiff described arthroscopic surgery to his left shoulder in 2001 after he sustained an injury to that shoulder while opening a door.  Plaintiff told the doctor that in late January he was driving a vehicle without power steering and developed pain in the left shoulder. (*Id*. at 2.)  Thereafter, Dr. Austin prescribed physical therapy and recommended a power steering restriction which has applied to Plaintiff since that time.

On physical examination, the doctor found that Plaintiff had full range of motion in the cervical spine without tenderness.  (*Id*. at 3.)  The doctor found no atrophy, deformity or discoloration in either shoulder.  Plaintiff exhibited full range of motion in both shoulders, although he complained of discomfort at the extreme range of motion in the left shoulder.  Both shoulders exhibited some crepitation. The doctor found no localized neurological deficits in either shoulder.  (*Id*. at 4.)  Sensation was normal as were various orthopedic tests for carpal tunnel syndrome.  Plaintiff's elbows exhibited full range of motion without tenderness.  The doctor diagnosed impingement syndrome and tendinitis of the left shoulder.  (*Id*.)  The doctor stated that "[b]ased on the history and physical examination of this individual, I agree with a short course of physical therapy three times a week for two weeks for the left shoulder.  I would strongly recommend return to work with a vehicle that has power steering." (*Id*. at 5.)  The doctor felt that

Plaintiff did not require further diagnostic testing or surgery at that time, but did state: "I do feel treatment is necessary." (*Id.*)  The doctor also stated: "I would recommend strongly that he be allowed to drive a power steering vehicle permanently.  I do not feel he is in need of a Functional Capacity Evaluation." (*Id.*)

Plaintiff testified at the Workers' Compensation hearing that at approximately this same time he began receiving workers' compensation benefits.  He also stated that three weeks after benefits began, benefits were terminated.  (Def.'s Mot., Dkt. 13, Ex.1, p. 44-45.)

In early April 2004, Plaintiff received a letter from Kelly Renucci, District Workforce Planning Manager for UPS.  (*Id.*, Ex. 4.)  The letter requested medical information arising out of Plaintiff's "notification that you requested a job-related accommodation because of a self-reported physical or mental condition." (*Id.*)  The request was repeated approximately three weeks later. (*Id.*, Ex. 5.)  In late April, Defendant received a "Request for Medical Information" completed by Dr. Austin.  (*Id.*, Ex. 6.)  The doctor stated that Plaintiff was not at that time able to complete all the physical and mental functions of his job, noting that Plaintiff had a "minor shoulder limitation & needs power steering on delivery vehicle[.]" (*Id.*, Ex. 6 at 1.)  The doctor felt that no other medications or corrective devices would be required and that Plaintiff's condition would not "substantially limit the employee's ability to perform any major life activities other than working[.]" (*Id.* at 2.)  The doctor stated that his diagnosis was based upon arthroscopic surgery, physical examination, and x-rays.  (*Id.* at 3.)  During this same period, UPS employees apparently began an "Accommodation Request" for Plaintiff. (*Id.*, Ex. 7.)  The request noted that Plaintiff's last day at work was March 1, 2004. (*Id.*)

On May 3, 2004, Dr. Austin stated that Plaintiff should be off work until August 3, 2004. (*Id.*, Ex. 9.)  On May 12, 2004, Ms. Renucci forwarded a letter to Plaintiff stating that "based upon

the medical information we have received we are unable to conclude that you are eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act." (*Id*., Ex. 8.)

On June 4, 2004, Plaintiff filed a "Charge of Discrimination" with the Michigan Civil Rights Commission. (*Id*., Ex. 10.) Plaintiff stated that he was "removed from [his] job due to restrictions imposed by [his] doctor," and that he had requested reasonable accommodations in the past "to no avail." (*Id*.) In the "Discrimination Based On" section of the document, the boxes "Retaliation," "Age" and "Disability" are checked. (*Id*.)

On June 23, 2004, Plaintiff underwent the surgical repair of a muscle tear in his left shoulder. (Dkt. 19, Ex. 4.) On July 29, 2004, Dr. Austin stated that Plaintiff should be considered off work until September. (Dkt. 13, Ex. 11.)

In early September 2004, Dr. Austin reported that Plaintiff's shoulder was "moving pretty well. I am happy with his range of motion. He is not having a lot of symptoms now." (Dkt. 19, Ex. 4.) The doctor went on to state that Plaintiff was "not doing much with it because they have not accommodated his power steering restriction. I stand by my statement that realistically he needs a power steering truck to work as a UPS driver. I will keep those restrictions in place[.]" (*Id*.)

At the Workers' Compensation hearing, Plaintiff testified that on September 2, 2004, the day after he received clearance from Dr. Austin, he approached his manager, Mr. Keefer, with the restrictions given by Dr Austin and was told that there was no work available for him. (Dkt. 13, Ex.1 at 51.) Plaintiff testified that Keefer told him that "If you're not a hundred percent healthy we have nothing for you." (*Id*. at 53.) Plaintiff also testified that his route remained in existence, and that another employee, Bill Connelly, was assigned to it. (*Id*. at 51.) At the hearing, Plaintiff

expressed his understanding that he was "entitled" to this route under the collective bargaining contract, or to another job within UPS. (*Id*. at 53-54.)

In mid-October 2004, Dr. Austin stated in a progress note that Plaintiff was "moving better. He looks pretty good. I have his physical therapy report stating that he made very good progress there. . . . I stand by my statement that he could work without restrictions except for power steering." (*Id*., Ex. 12.) The doctor concluded his notes by stating that Plaintiff could "return to work if they will give him a power steering truck." (*Id*.) The same day, Dr. Austin cleared Plaintiff to return to work for the next six months with a restriction to use only vehicles with power steering. (*Id*., Ex. 13.)

According to Defendant, Plaintiff returned to work March 7, 2005, when his medical restrictions were lifted. (Def.'s Reply, Dkt 20 at 5.)

**D.      Arguments of the Parties**

Defendant first argues that Plaintiff cannot prevail on his ADA claim because he meets none of the statutory definitions for disability, as he does not have a physical or mental impairment that substantially limits a major life activity, does not have a record of such an impairment, or cannot be considered as having such an impairment. Defendant argues that Plaintiff's medical restriction for a power steering vehicle is not indicative of the inability to engage in a "major life activity" as this term has been interpreted by the courts. More specifically, Defendant argues that Plaintiff's only possible "major life activity" impairment is that of working, and since Plaintiff stated in his deposition that he was capable of performing his prior work as long as he was issued a power steering vehicle, along with a broad range of other jobs, he was not impaired in the major life activity of working. According to Defendant, at most, Plaintiff is suffering from a temporary impairment in his ability to undertake his prior work.

12

Defendant next argues that Plaintiff cannot be "regarded as" having a disability because the evidence makes clear that Defendant was under none of the misperceptions found by the United States Supreme Court to be necessary for the application of the "regarded as" standard. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). Defendant then asserts that Plaintiff has no "record of disability" within the meaning of the ADA because the temporary inability to work, even on more than one occasion, does not constitute evidence of a disability covered by the Act. Citing excerpts of Plaintiff's testimony during the Workers' Compensation proceeding, Defendant also argues that Plaintiff's ADA claims are now barred by the doctrine of judicial estoppel.

Defendant also argues that Plaintiff's FMLA claim fails as he has not stated a claim for intermittent leave within the meaning of that statute. Defendant argues that Plaintiff is not claiming intermittent leave because of unanticipated medical treatment for a serious health condition or that he has a chronic medical condition that causes periodic incapacity to work.

Defendant also argues that Plaintiff cannot make a retaliation claim, as the alleged actions which give rise to the claim took place prior to, and not after, his engaging in the protected activity of filing a civil rights claim.

In response to Defendant's motion, counsel for Plaintiff appears to concede that Plaintiff is not disabled within the meaning of the ADA; "Plaintiff does not dispute that, at the time Defendant refused to return Plaintiff to work following his recovery from his last shoulder injury, he did not have an actual limiting impairment as described" in the ADA. (Pl.'s Resp., Dkt. 19 at 11.) In responding to Defendant's arguments that a temporary inability to work does not constitute disability, counsel for Plaintiff states, "That might be true if Plaintiff were claiming a current disability, but he is not." (*Id.* at 13 & 14.) Citing various provisions of the ADA, along with its

13

interpretive regulations and case law, Plaintiff argues that he meets the "record" or "history of" definitions of disability, as he suffered extended periods when he was recovering from his various shoulder injuries and surgeries during which he was substantially impaired from performing virtually any manual task with his arms. Plaintiff argues that Defendant was aware, through the medical records forwarded to them, of Plaintiff's chronic shoulder problems and that Plaintiff has as much admitted that. (*Id.* at 15.) Plaintiff asserts that Defendant's refusal to allow him back to work because of his prior history of disability amounts to precisely the form of discrimination Congress intended to eliminate through the ADA.

In response to Defendant's invocation of judicial estoppel, Plaintiff argues that there was nothing in his testimony in the Workers' Compensation proceedings that was inconsistent with his current claim that he was refused employment because of his past history of substantially limiting impairments to his shoulder. Citing the same findings of the Workers' Compensation Magistrate, quoted in Defendant's brief, Plaintiff asserts that they are entirely consistent with Plaintiff's position and, in fact, supports Plaintiff's claim that Defendant refused Plaintiff's request for work because of his past history of injuries.

As to his FMLA claim, Plaintiff argues that his shoulder condition is in fact a chronic, serious, and incapacitating health condition within the meaning of the FMLA. Plaintiff argues that Defendant violated the FMLA by effectively terminating him rather than granting him intermittent leave as required under the Act due to his health condition. Plaintiff argues that the physician's requirement that he drive a power steering vehicle demonstrates that the condition of his shoulders incapacitates him from driving without power steering and is further support for the contention that the condition of his shoulders is chronic, serious and disabling.

Plaintiff also contends that Defendant misconstrues his retaliation claim, alleging that the Defendant refused to consider Plaintiff for reinstatement after June 4, 2004, a date subsequent to Plaintiff's Michigan civil rights filing.

In its reply, Defendant argues that even if Plaintiff had a "record or history of disability," the Defendant had no duty to accommodate Plaintiff's restriction, citing cases stated to support the proposition that accommodations are unnecessary for persons without an actual disability and that no cause of action lies for an employer's failure to accommodate an employee unless that employee is actually disabled within the meaning of the ADA. Defendant further argues that the three periods cited in Plaintiff's affidavit, during the last twelve years in which he was temporarily restricted from recovering from his injuries, do not establish a "record of disability" within the meaning of the statute, citing cases and administrative rules for the proposition that an impairment's impact must be "permanent or long term" in order to qualify. Defendant cites a series of cases in which allegedly plaintiffs who were disabled for periods between seven and sixteen months were found not to have the requisite record of disability.

## E.   Motion for Judgment on the Pleadings and/or Summary Judgment

### 1.   Governing Legal Standards

Both Defendant's original motion and continued motion are filed alternatively under Rules 12 and 56. Rule 12(c) of the Federal Rules of Civil Procedure provides that when "matters outside the pleading are presented to *and not excluded by the court*, the motion [to dismiss] shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(c) (emphasis added). In their treatise, Wright and Miller explain that, pursuant to the portion of the rule italicized above,

> [t]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion. This discretion generally will be exercised on the basis of a determination of whether or not the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate the disposition of the action.

5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (footnote omitted).

Extensive exhibits have been filed, which I conclude are worthy of review and consideration. It is clear that both parties rely upon these documents, thus presuming that the Court will accept and review them. After reviewing the exhibits, I cannot discern that any party will be prejudiced. I therefore conclude that matters outside the pleadings should be accepted and the motion considered under Rule 56, as the acceptance and review of these documents will materially facilitate the disposition of the instant motion.

A motion for summary judgment will be granted under Rule 56(c) where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit explicitly instructs that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### 2.      Plaintiff's ADA and PWDCRA Claims[4] (Counts II and III)[5]

### a.      Governing Legal Standards

The ADA reads in relevant part, "No covered entity[6] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This broad remedial statute places on covered employers the affirmative duty of "making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship. . . ." *Id*. § 12112(b)(5)(A). The ADA expands the protections of the Rehabilitation Act[7] to a wider class of employers and individuals. The ADA itself, and the Supreme Court's interpretations of that statute, require lower courts to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act. *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998).

As explained by Judge Daughtrey,

---

[4]Although not in the order laid out in Plaintiff's complaint, I will consider each count of Plaintiff's complaint in the order briefed and argued.

[5]Although there are some linguistic differences between the ADA and the PWDCRA, the Michigan Supreme Court has noted that both statutes "require *essentially* the same analysis in any predominant number of cases. The result under either statute may well be the same." *Peden v. City of Detroit*, 470 Mich. 195, 680 N.W.2d 857, 870 (2004); *see also Salim v. MGM Grand Detroit, L.L.C.*, 106 Fed. Appx. 454 (6th Cir. 2004). Neither party has argued that the differences between these statutes are material to the resolution of this case.

[6]There is in this case no dispute that Defendant UPS is a "covered entity" within the meaning of the ADA. 42 U.S.C. § 12111(2) and (5)(A).

[7]29 U.S.C. § 701 *et seq.*

> . . . [T]he drafters of the ADA created a vision of membership in a protected class unlike that embodied by other civil rights legislation, such as Title VII of the civil Rights Act, 42 U.S.C. § 2000e-2 (2000), or the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623 (2000). . . .  The breadth of the Act's protection is the embodiment of its drafters' will to stamp out the stereotyping of an discrimination against persons with disabilities in all their forms, even when that stereotyping or discrimination is misplaced.

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

The gravamen of Plaintiff's complaint is that the Defendant, acting under a deliberate corporate policy, refused to accommodate Plaintiff's need for a power steering vehicle.  (Pl.'s Compl., Dkt. 1, ¶¶ 18-20.)  In order to prevail on a failure to accommodate claim, an employee must show: (1) that he is disabled; (2) that he is qualified for the job with or without reasonable accommodation; and (3) that he was denied a reasonable accommodation.  *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

**b.      Discussion**

The first step, that of disability, is hotly contested by the parties.  The ADA defines the term "disability" broadly:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

As noted earlier, Plaintiff effectively concedes that he is not disabled within the meaning of subsection (A).  Instead, Plaintiff argues that he has a record of disability, or in the alternative, has been "regarded as" disabled within the meaning of subsections (B) and (C).

I first suggest that Plaintiff has met his burden of establishing "a record of such an impairment" within the meaning of the ADA. A "record of impairment" means that an individual has "'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (citing 28 C.F.R. § 35.104(3)). The record in this case is replete with reports from Plaintiff's various treating physicians that were forwarded to Defendant, as well as reports of physicians who examined Plaintiff at the request of the Defendant. These medical records unequivocally portray that on numerous occasions, Dr. Austin, as well as Plaintiff's other treating physicians, placed significant restrictions on Plaintiff's ability to lift. The Equal Employment Opportunity Commission's Interpretive Guidance specifically includes "lifting" as a "major life activity." 29 C.F.R. Pt. 1630, App. § 1630.2(i); *see Penny v. U.P.S.*, 128 F.3d 408, 414 (6th Cir. 1997); *see also Mahon v. Crowell*, 295 F.3d 585, 591 (6th Cir. 2002). In addition, Defendant placed Plaintiff in an off-work status from July 1993 to October 1, 1994 (Dunning Aff., Dkt. 19, Ex. 1, ¶¶ 2-7); from March 19, 1995, to January 31, 1996 (*id.* ¶¶ 8-11); and from February 2001 to November 23, 2001 (*id.* ¶ 17); and subsequent to Plaintiff's January 2004 left shoulder injury (*id.* ¶ 18). I therefore suggest that viewing the evidence in the light most favorable to Plaintiff, he has met his burden of establishing a "record of disability," and is thus to be considered "disabled" as defined by the ADA.

In the alternative, *Ross*, *supra*, discusses at length the "regarded as" prong of the ADA disability definition. Judge Daughtrey points out:

> . . . Thus, in determining who may invoke the protection of the ADA, we do not always look to the individual claiming discrimination; when that individual seeks to proceed under a "regarded as" theory, we must look to the state of mind of the employer against whom he makes a claim. Under the "regarded as" prong of the ADA, membership in the protected class becomes a question of intent. And, as the

district court correctly noted, "that question-*i.e.*, the employer's motive-is one rarely susceptible to resolution at the summary judgment stage."

In analyzing the "regarded as" prong of the ADA, the Supreme Court recently held:

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties.

*Ross*, 237 F.3d at 706.

Under these standards, I suggest that when viewed in a light most favorable to Plaintiff, there is sufficient evidence to create a genuine issue of disputed material fact on his claim that he was "regarded as" disabled by Defendant within the meaning of the ADA. In February 2004, Plaintiff was placed on the UPS TAW program. Subsequently, he was removed from that program. Plaintiff's supervisor confirmed these facts during his testimony at Plaintiff's Workers' Compensation hearing. (Def.'s Mot., Dkt. 13, Ex. 1 at 81.) In fact, the Plaintiff's supervisor, Mr. Keefer, acknowledged that he never told Plaintiff that he had been placed in the TAW status until the day he told Plaintiff that Plaintiff was being removed from that status. (*Id.*) Plaintiff alleges that his supervisor's comments clearly and unequivocally implied that Plaintiff was "less than a hundred percent." (*Id.* at 53.) Plaintiff was given Workers' Compensation benefits by Defendant, and three weeks later those benefits were withdrawn. Moreover, as in *Ross*, UPS employees

21

apparently specifically considered his eligibility under the ADA and began an "Accommodation Request" for Plaintiff (Dkt. 13, Ex. 7), which resulted in a mid-May 2004 letter from UPS, stating that "based upon the medical information we have received we are unable to conclude that you are eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act." (*Id.*, Ex. 8.) I therefore suggest that Plaintiff has met his burden of establishing that UPS "regarded" [him] "as" disabled within the meaning of the ADA.

I further suggest that viewing the evidence in the light most favorable to Plaintiff, he has met his burden of establishing genuine issues of disputed material fact as to the remaining steps of the ADA analysis above. At step two, I suggest that the evidence is clear that on multiple occasions Plaintiff's treating physicians considered him qualified to undertake his job so long as he was accommodated through the use of a power steering vehicle. (Def.'s Mot., Dkt. 13, Ex. 1 at 43, Ex. 2, Ex. 3 at 5, Exs. 12 & 13; Pl.'s Resp., Dkt. 19, Ex. 4.) He has therefore, I suggest, established a genuine issue of disputed material fact as to whether he is "qualified for the job with . . . [a] reasonable accommodation" as this term is interpreted in this circuit. *Rouch, supra.*

As to the third step, at the threshold, I suggest that there is no question on this record that the accommodation requested by Plaintiff was denied. (Def.'s Mot., Dkt. 13, Ex. 8 and Ex. 1 at 51 & 53.) I further suggest that since the Defendant's Saginaw center had 33 power steering trucks (Def.'s Cont. Mot., Dkt. 45, Ex. 21), since Plaintiff was a senior employee under the Union Collective Bargaining Agreement (Def.'s Mot., Dkt. 13, Ex 1 at 53-54), and since the Collective Bargaining Agreement provided that all new trucks purchased for the Saginaw center have power steering (Pl.'s Compl., Dkt. 1, ¶ 24), Plaintiff has raised, when viewed in the light most favorable to Plaintiff, genuine issues of disputed material fact as to whether or not the accommodation requested by Plaintiff was reasonable.

Defendant's arguments to the contrary, I suggest, fail to carry the day. Defendant cannot have it both ways. It cannot place Plaintiff in TAW status, never inform him of that decision until shortly before withdrawing that status, give him Workers' Compensation benefits, withdraw those benefits three weeks later, process an "Accommodation Request," inform him that he does not qualify for an accommodation under the ADA, and then argue before this Court that he is not entitled to the application of the ADA and PWDCRA at all. Moreover, the fact that Defendant denied Plaintiff's request for the power steering accommodation (Dkt. 13, Ex. 8) is not, I suggest, as argued by Defendant, determinative of this motion.

Defendant also argues that judicial estoppel bars the instant case, citing perceived inconsistencies between the claims made in the instant complaint, and testimony Plaintiff gave at the Workers' Compensation hearing. Defendant supports this argument with the following excerpt of the Workers' Compensation Magistrate's findings; "Although Plaintiff is willing to come back and work with power steering vehicles only, Defendant has made that impossible for Plaintiff." (Dkt. 13, Ex. 17 at 13.) Defendant's invocation of judicial estoppel is, I suggest, devoid of merit. Far from inconsistent, I suggest that this finding is of a piece with Plaintiff's claims, and in fact supports, rather than weakens, Plaintiff's position. For these reasons, I therefore suggest that as to Plaintiff's ADA claims, Defendant's motion be denied.

### 3. Plaintiff's FMLA Claim (Count I)

### a. Governing Legal Standards

The FMLA provides eligible employees with a maximum of twelve weeks of unpaid leave in a given twelve-month period to attend to certain family and medical matters. 29 U.S.C. § 2612(a). Leave may be taken for specified reasons, including childbirth, adoption, the care of a spouse, parent, or child who suffers from a serious health condition, or "[b]ecause of a serious

23

health condition that makes the employee unable to perform the functions of the position of such employee." *Id*. Upon return from FMLA leave, an employer must restore an employee to his former job or another position with equivalent pay, benefits, and conditions of employment. 29 U.S.C. § 2614(a)(1). Employers who violate the FMLA are liable to the injured employee for compensatory damages, back pay, and equitable relief. 29 U.S.C. § 2617(a)(1).

In order to trigger application of the FMLA, an employee must provide the employer with notice that he or she needs FMLA-qualifying leave. *See, e.g., George v. Associated Stationers*, 932 F. Supp. 1012, 1016 (N.D. Ohio 1996). To satisfy this requirement, the employee need not expressly invoke his or her FMLA rights, but need only request leave for one of the reasons listed in the statute. 29 C.F.R. § 825.303(b) (stating that an "employee need not expressly assert rights under the FMLA, or even mention the FMLA, but may only state that leave is needed"). *See also George*, 932 F. Supp. at 1016 (stating that the employee is "not required to assert rights under the Act").

### b.    Discussion

At the threshold, I suggest that there is no dispute that Defendant is an eligible employer to which the FMLA applies, and that Plaintiff, with over 20 years of service, is an eligible employee. *See* 29 U.S.C. § 2611(2)(B)(ii). Rather, at issue in this case is Plaintiff's entitlement to FMLA leave under the last of the reasons listed above; i.e., serious medical condition. To prove entitlement to leave for a "serious medical condition" under 29 U.S.C. § 2612(1)(D), Plaintiff must prove that he meets the definition of a "serious health condition." According to 29 U.S.C. § 2611, a "serious health condition":

means an illness, injury, impairment, or physical or mental condition that involves–

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11).  The regulations interpreting this definition provide further detail on the

"continuing treatment" prong.  They state:  A serious health condition involving continuing

treatment by a health care provider includes any one or more of the following:

> (i) A period of incapacity (i.e., *inability to work*, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2) (emphasis added).

I suggest that viewing the evidence in the light most favorable to Plaintiff, he has met his

burden of establishing a substantial issue of disputed material fact as to his eligibility for FMLA

leave based upon a "serious medical condition."  I suggest that the medical records of Dr. Austin

and Plaintiff's other treating physicians demonstrate multiple periods of incapacity, much longer

than three consecutive calendar days, involving multiple treatments by health care providers,

nurses, and physicians, resulting on more than one occasion in a "regimen of continuing treatment

under the supervision of the health care provider," which involved, among other things, repeated

examinations, prescriptions for physical therapy, and multiple surgical procedures.

I next suggest that viewing the evidence in the light most favorable to Plaintiff, he has met

his burden of establishing a genuine issue of disputed material fact with regard to his invocation

of FMLA rights.  As pointed out above, an employee need only state that leave is needed for any

of the reasons set forth in 29 U.S.C. 2612(a).  *George*, 932 F. Supp. at 1016.  Plaintiff's request for time off, especially that made in January 2004, due to his shoulder condition, I suggest, fully qualifies under this standard.

I next suggest that viewing the evidence in the light most favorable to Plaintiff, he has met his burden of establishing a genuine issue of disputed material fact as to whether Defendant violated Plaintiff's rights under the FMLA.  Mr. Keefer's refusal, on more than one occasion, to reinstate Plaintiff to his original position upon his clearance to do so by Dr. Austin (with the power steering proviso), a refusal confirmed by Mr. Keefer himself  (Def.'s Mot., Dkt. 13, Ex. 1 at 81), could, I suggest, qualify as a violation of 29 U.S.C. § 2614(a)(1).

I therefore suggest that as to Plaintiff's FMLA claims, Defendant's motion be denied.

### 4.      Plaintiff's Retaliation Claims (Counts IV and V)

### a.      Governing Legal Standards

To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse action.  *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588-89 (6th Cir. 1998).

The FMLA also prohibits an employer from retaliating against an employee who exercises his rights under the FMLA.  29 U.S.C. § 2615.  In order to establish a prima facie case of retaliation under the FMLA, a plaintiff must prove that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) a causal connection exists between the two actions.  *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

26

Retaliation claims under both statutes can be proved by direct evidence. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th  Cir. 2003). "[A]n employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action." *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir. 2002). "Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

Where there is no direct evidence, retaliation claims under both statutes are to be considered under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) burden shifting framework. Under *McDonnell Douglas*, a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802; *Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 462 N.W.2d 758 (1990). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Plaintiff must then prove that the reason put forth by the defendant was a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

27

**b.     Discussion**

Plaintiff maintains that his claims of retaliation are predicated on the treatment he received subsequent to the filing of his discrimination claim with the Michigan Department of Civil Rights. (Dkt. 13, Ex. 10).  I note in addition, however, that Plaintiff, as described above, also sought to invoke his rights under both the ADA and the FMLA.

I first suggest that the evidence has established the first prongs of these standards.  The evidence borders on the undisputed that Plaintiff availed himself of protected rights under ADA, the FMLA and by filing a complaint of discrimination with the Michigan Department of Civil Rights.  Defendant's own records and statements by Plaintiff's supervisor confirm these facts. (Def.'s Mot., Dkt. 13, Ex. 1 at 81 & Ex. 8.)

When viewed in the light most favorable to Plaintiff, I further suggest that he has met his burden of establishing a genuine disputed material fact on the question of whether discriminatory animus motivated Defendant's denials, and thus whether there is a causal connection between Plaintiff's protected activity and Defendant's action.  Moreover,  Keefer's alleged remark that "if you're not a hundred percent healthy we have nothing for you," described by Plaintiff while under oath during the Workers' Compensation hearing (Def.'s Mot., Dkt. 13, Ex. 1 at 53), may in fact be direct evidence of discriminatory animus, as I suggest that a reasonable jury could conclude that "unlawful discrimination was at least a motivating factor" underlying the remark.  *Jacklyn, supra.*  I therefore suggest that as to Plaintiff's retaliation claims, Defendant's motion be denied.

**5.     Public Policy Claim (Count VI)**

**a.     Introduction and Governing Legal Standards**

In this two paragraph Count, Plaintiff cites  Section 418.301(11) of the Michigan Compiled Laws and alleges that Defendant "violated the public policy of the State of Michigan. . . in

removing Plaintiff from his position. . . and in refusing to reinstate Plaintiff thereafter[.] . . . (Compl. ¶ 65.)

The provision cited by Plaintiff, contained within Michigan's Workers' Compensation Act, provides that :

> A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

MICH. COMP. LAWS ANN. § 418.301(11).

Relatively little was said about this claim in the motion papers or during oral argument. Defendant argues that this claim has been mooted by Plaintiff's return to work in March 2005.

### b.    Discussion

At the threshold, I suggest that this count effectively amounts to a claim of retaliatory discharge predicated upon his exercise of rights under the Michigan Workers' Compensation Act. I note further that while based upon state law, it has been held in this district that 18 U.S.C. § 1445(c) is not applicable to claims of this nature, and that remand of such a claim is not appropriate. *Obeid v. Meridian Automotive Systems,* 296 F. Supp. 2d 751, 757 (E. D. Mich. 2003) (Cleland, J.)

In order to establish a prima facie case of retaliatory discharge under this statute, Plaintiff must prove that (1) he asserted his right to workers' compensation benefits; (2) the Defendant knew that Plaintiff asserted his right to workers' compensation benefits; (3) the Defendant terminated Plaintiff; and (4) there was a causal connection between Plaintiff's assertion of his right to workers' compensation benefits and his termination. *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 470, 606 N.W.2d 398 (1999) (discussing *DeFlaviis v. Lord & Taylor, Inc*., 223 Mich.

App. 432, 436, 566 N.W.2d 661 (1997)). In addition, the McDonnell Douglas burden shifting

formulation applies. *Chiles*, 238 Mich. App. at 470, 606 N.W.2d 398; *see also Chisolm v.*

*Michigan AFSCME Council 25*, 218 F. Supp. 2d 855, 873-874 (E.D. Mich. 2002) (Borman, J.)

These are substantially the same elements Plaintiff must show in support of his other

retaliation claims. Accordingly, because I have suggested that Plaintiff has met his burden of

establishing genuine issues of disputed material fact as to his other retaliation claims, I suggest that

the grant of Defendant's motion as to this count is also at this time premature.

### F.      Motion for Imposition of Sanctions

### 1.      Introduction and Governing Legal Standards

Plaintiff seeks the imposition of issue-dispositive sanctions, pointing to what counsel

characterizes as a pattern of dilatory conduct, amounting to violations of earlier discovery orders,

which have prejudiced Plaintiff's ability to prepare and take discovery depositions in a timely

manner. In its response, Defendant admits that discovery has not been produced by the dates set

forth in earlier discovery orders, and contends that "UPS's admitted and unfortunate delay in

producing the documents" (Def's Resp., Dkt. 41 at 1) has not actually prejudiced Plaintiff.

Defendant points to the complexity of the discovery ordered by this judicial officer and describes

in detail the number of employees required to sift and digest corporate data in order to comply with

those directives, as well as its production of over 14,000 pages of documents. Defendant argues

that the delay in production in no way reflects willful intent on Defendant's part and maintains that

Plaintiff is now in possession of all the documents ordered produced by this Court.

Rule 37(b)(2) of the Federal Rules of Civil Procedure permits a court to "make such orders

. . . as are just" when a party has failed to "obey an order to provide or permit discovery, including

an order made under [Rule 37(a)] or Rule 35, or if a party fails to obey an order entered under Rule

26(f)[.]" FED. R. CIV. P. 37(b)(2).  Examples of such orders, depending upon the circumstances, are: "an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]" FED. R. CIV. P. 37(b)(2)(C).

The Supreme Court has affirmed the inherent power of a district court to sanction the bad-faith conduct of a party or their attorneys.  *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).  Rule 37 has been consistently construed to require a showing of bad faith or willfulness before a court may impose the ultimate sanction of dismissal.  *See Harmon v. CSX Transportation, Inc.*, 110 F.3d 364 (6th Cir. 1997); *Regional Refuse Systems, Inc. v. Inland Reclamation Co.*, 842 F.2d 150 (6th Cir. 1988).  In this circuit,

> [a]mong the factors to be considered in reviewing the imposition of sanctions for an abuse of discretion, the appellate court should consider:  (1) whether the adversary was prejudiced by the [sanctioned] party's failure to cooperate in discovery, (2) whether the [sanctioned] party was warned that failure to cooperate could lead to [such a sanction], and (3) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Taylor v. Medtronics, Inc.*, 861 F.2d 980, 986 (6th Cir. 1988) (citing *Regional Refuse Systems*, 842 F.2d at 155).  Dismissal is therefore the sanction of last resort and "[i]t should be imposed only if the court concludes that the party's failure to cooperate in discovery was willful, in bad faith, or due to its own fault."  *Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994) (citing *Taylor*, 861 F.2d at 985).

### 2.    Analysis and Conclusions

I note at the outset that Plaintiff seeks the imposition of the most serious sanctions possible under Rule 37, sanctions characterized in the nature of the "last resort" and which should be

imposed only upon a finding of a failure to cooperate motivated by willful intent or bad faith. *Beil*, *supra*.

After review of the documents, the arguments of the parties, and the exhibits filed in support of this and other motions, I am unable to find the willful bad faith required for the imposition of issue-dispositive sanctions. Both parties are correct that the production earlier ordered by this Magistrate Judge was not accomplished in a timely manner. However, I agree with the representations of defense counsel that the data compilations I ordered produced were not kept in the ordinary course of UPS's business and required UPS employees to sift and correlate thousands of documents. From the depth and breadth of Plaintiff's response to both this and other motions, I am unable to discern that Plaintiff was substantially prejudiced by the delays in UPS's production. While certainly not pleased with the timing of Defendant's production of documents, I am unable to conclude that the circumstances underlying that production meet the standards for the issuance of issue-dispositive sanctions under Rule 37 and therefore suggest that denial of Plaintiff's motion is appropriate.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y*

*of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


 s/  *Charles E Binder*

CHARLES E. BINDER
Dated: January 17, 2006                    United States Magistrate Judge



## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Debra A. Freid, Bonnie L. Mayfield and Todd J. Shoudy, and served in the traditional manner on Honorable David M. Lawson.


Dated:  January 17, 2006                    By____s/Mary E. Dobbick_____
                                             Secretary to Magistrate Judge Binder